**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

DEPARTMENT OF TOXIC SUBSTANCE
CONTROL,

12

Plaintiff,

13

v.

14

TECHNICHEM, INC, et al.,

15

Defendants.

16

No. C 12-5845 CRB

**ORDER GRANTING APPROVAL
AND ENTRY OF CONSENT DECREE**

17

18

19

20

21

22

23

24

25

26

27

28

Presently before the Court is the motion of the Department of Toxic Substance

Control ("DTSC") for Approval and Entry of a Consent Decree with defendants Inter-City

Cleaners, LLC; Hans Gelfand; County of Stanislaus; Hakuyosha International, Inc.; Chris

and Ken Enterprises, Inc., dba Crown Cleaners; Paul's Dry Cleaners; M & M Cleaners; Pak

Hee Kyoo dba M & M Cleaners; Irvin Pressman and Annette Pressman, dba E. Pressman &

A. Pressman Partners Dollar Cleaners; Irvin Pressman; Annette Pressman; and Prudential

Overall Supply (collectively, "Settling Defendants") to settle a claim pursuant to the

Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").

See generally Mot. (dkt. 34).

The Court held a hearing on the matter on June 28, 2013.  Counsel representing the

parties who filed briefs in this matter, as well as counsel for certain Settling Defendants, were

present at the hearing.  For reasons set forth below, the Court GRANTS the DTSC's Motion

for Approval and Entry of the Consent Decree.

1

**I.      BACKGROUND**

2        From approximately 1987 to 2003, Technichem, Inc. ("Technichem"), owned by

3   Mark Ng, operated a business in Emeryville, California ("the Site").  Mot. at 2.  The DTSC

4   alleges that the transportation, treatment, and disposal of wastes containing

5   perchloroethylene (PCE) occurred at the Site throughout Technichem's operation.  Id.  PCE

6   is a "hazardous substance" as defined in section 101(14) of CERCLA, 42 U.S.C. § 9601(14),

7   which is commonly used in the dry cleaning industry.  Id.  The building that formerly housed

8   the Technichem business is owned by Virginia Pellegrini ("Pellegrini").  Id. at 3.  Pellegrini

9   and Technichem are potentially responsible parties ("PRPs") who have not settled with the

10  DTSC.  In January 2013, the DTSC, filed a claim under CERCLA, 42 U.S.C. §§ 9607 and

11  9613, to recover costs it had incurred and expects to incur in response to the leak of

12  hazardous materials at the Site.  Mot. at 1.

13       The Settling Defendants are current and former businesses in the garment cleaning

14  industry.  The DTSC contends that the Settling Defendants are liable under CERCLA

15  because they arranged for disposal or treatment of hazardous substances at the Site, and/or

16  arranged with a transporter for transport of hazardous materials to the Site for disposal or

17  treatment, as described in section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).  Mot. at 4.

18  The DTSC identified 640 parties ("Arrangers"), who had arranged for hazardous material to

19  be transported to the Site.  However, the DTSC focused its cost recovery efforts on Arrangers

20  who had contributed significant waste.[1]  Toth Decl. (dkt. 34-1) ¶ 14.

21       Because the DTSC has not formally approved a remedy for the Site, the total future

22  costs are unknown at this time.  Id. ¶ 17.  However, the DTSC expects that in-site clean-up

23  measures will suffice.  Id.  As of March 31, 2013, the DTSC has incurred $1,414,770 in costs

24  responding to the contamination of the Site.  Id.  For purposes of the Consent Decree, the

25

26       [1]  Consequently the Settling Defendants are composed of Arrangers who arranged for the
     transportation of more than 0.6799 tons of hazardous waste to the Site. Arrangers who contributed less
27   were not targeted by the DTSC for cost recovery.

28                                           2

**United States District Court**
For the Northern District of California

1  DTSC has estimated that the cost of clean-up will be approximately $3 million, which

2  includes attorneys' fees accrued in settling this matter.  Id. ¶¶ 13, 16.

3        The DTSC decided to allocate half of the total cost—$1.5 million— to the Arrangers.

4  Id. ¶ 13.  The DTSC distributed half the clean-up costs among the Arrangers targeted for

5  recovery in accordance with the amount of hazardous waste that records suggested they sent

6  to the Site.  Toth Decl. ¶ 14.  The Consent Decree provides that the Settling Defendants will

7  collectively pay $186,690 to the DTSC to settle the matter.  Malinsky Decl. ¶ 9, Ex. 2.

8  Under the terms of the Consent Decree the Settling Defendants will be immune from future

9  contribution claims from other PRPs.  Mot. at 9.

10        Pelligrini, the property owner, has submitted a statement of non-opposition and

11  limited opposition to the motion for approval of the Consent Decree.  See Opp'n (dkt 37).

12  Pellegrini does not oppose the proposed settlements with the Settling Defendants, but objects

13  to the Consent Decree on the grounds that (1) it is not substantively fair because it allocates a

14  disproportionate amount of liability to her and (2) the estimated total cost of clean-up cannot

15  be accurately determined at this time.  Opp'n at 1-3.  Pellegrini requests the Court amend the

16  Consent Decree to limit contribution protection among the Settling Defendants to the current

17  $3 million estimated cost of clean-up or increase the amount they must pay to settle in

18  exchange for their protection from future liability.  Id. at 4.

19  **II.  LEGAL STANDARD**

20        A district court reviews a consent decree to determine whether the decree is

21  "fundamentally fair, adequate, and reasonable," United States v. Oregon, 913 F.2d 576, 580

22  (9th Cir. 1990), and in light of the public policy favoring settlements, see United States v.

23  Comunidades Unidas Contra La Contaminacion, 204 F.3d 275, 280 (1st Cir. 2000).  This

24  deference is particularly strong where the decree has been negotiated by the Attorney

25  General on behalf on a government agency that is an expert in its field.  See United States v.

26  Akzo Coatings of Am., Inc., 949 F.2d 1409, 1436 (6th Cir. 1991).  However, while it is

27  appropriate to pay such deference, a court must avoid giving a "rubberstamp approval" and

28                                                 3

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1  instead must conduct an independent investigation.  See United States v. BP Exploration &

2  Oil Co., 167 F. Supp. 2d 1045, 1050 (N.D. Ind. 2001).  Where a consent decree impacts

3  public interests, a court has a heightened responsibility if the interests at stake where not

4  represented in the negotiating process.  Oregon, 913 F.2d at 581.

5  In applying the "fair, adequate and reasonable standard," a court examines both

6  procedural and substantive fairness.  United States v. Cannons Eng'g Corp., 899 F.2d 79, 86

7  (1st Cir. 1990).  A court typically first examines procedural fairness, and makes a

8  determination as to whether the negotiation process was "fair and full of adversarial vigor."

9  United States v. Telluride Co., 849 F. Supp. 1400, 1402 (D. Colo. 1994).  If the decree was

10 the product of "good faith, arms-length negotiations," it is "presumptively valid and the

11 objecting party has a heavy burden of demonstrating the decree in unreasonable."  Oregon,

12 913 F. Supp. at 1404.

13 With respect to substantive fairness, it is not the duty of a court to determine whether

14 "the settlement is one which the court itself might have fashioned, or considers ideal."

15 Cannons, 899 F.2d at 84.  Instead, a "court's approval is nothing more than a amalgam of

16 delicate balancing, gross approximations and rough justice."  Oregon, 913 F.2d at 581.  "The

17 court need only be satisfied that the decree represents a reasonable factual and legal

18 determination."  Id.

19 **III.    DISCUSSION**

20 **A.    The Consent Decree is Procedurally Fair**

21 The procedural fairness of a proposed consent decree is reflected in a rational

22 collection of potentially settling parties followed by candid, balanced negotiations with said

23 parties.  See Cannons, 899 F.2d at 86.  Here, the DTSC took steps to ensure that the Settling

24 Defendants were comprised of parties that had contributed an amount of waste that the

25 DTSC deemed significant.  Toth Decl. ¶ 14.  The Settling Defendants, with the exception of

26 one, were all represented by counsel in the settlement negotiations.  Mot. at 11.  Indeed, it

27 appears that the Settling Defendants were well represented, as they obtained a favorable

28 result in the negotiations, settling for a little more than 10% of the costs that were allocated

to them.  Mot. at 8.  Therefore, the Court finds the Consent Decree to be procedurally fair.

**B.      The Consent Decree is Substantively Fair**

**1.      The Threat of Disproportionate Liability Does Not Make the Consent Decree Substantively Unfair**

The risk that Pellegrini will be obligated to pay an amount of clean-up costs disproportionate to her liability will exist regardless of the agreement between the DTSC and the Settling Defendants.  In other words, any consent decree to which Pellegrini is not a party would expose her to potentially disproportionate clean-up costs.  The fairness doctrine that guides a court's review of a consent decree is not a guarantee to non-settling PRPs of rigorous protection from having to pay more than their fair share.  "Settlements do not demand perfection.  There are many factors involved.  Therefore a court can usually confine its inquiry to the substantive fairness . . . to the proposed allocation of responsibility as between settling and non-settling parties."  City of Bangor v. Citizens Commc'n Co., 532 F.3d 70, 98 (1st Cir. 2008).

A perfect allocation of liability in CERCLA cases is impossible.  See United States v. Charles George Trucking, Inc., 34 F.3d 1081, 1088 (1st Cir. 1994).  A court sufficiently reviews the liability allocated in a consent decree when it ensures that "there is a basis for a sensible class wide approximation that roughly corresponds with some acceptable measure of comparative fault."  Id. at 1089.  Here, the DTSC allocated half of the total costs to the class of Arrangers.  Toth Decl. ¶ 13.  Investigations revealed that approximately 640 Arrangers had sent hazardous materials to the Site.  Id. ¶ 14.  Since a majority of the Arrangers had contributed a small fraction of the waste, the DTSC decided that Arrangers who generated less than 0.6799 tons of hazardous waste would not be targeted for recovery.  Id.  The DTSC's justification for allocating 50% of the total clean-up costs was "for the purposes of settlements."  Id. at ¶ 13.  Although this initial reasoning did not have a strong correlation to comparative fault, the DTSC took steps to ensure that the Settling Defendants had significantly contributed to the pollution of the Site.

**United States District Court**
For the Northern District of California

1    Pellegrini argues that the Consent Decree is not fair because it allocates 50% of the

2 clean-up costs to Defendants Technichem and to her, jointly and severally.  Opp'n at 2.

3 Pellegrini believes instead that 100% of the liability for all response costs should be assigned

4 to Technichem.  Id.  Due to Technichem's insolvency, Pellegrini fears that she will be left

5 paying 50% of the total clean-up cost.  Id.  The DTSC responds that the fact that Pellegrini

6 may have to pay more than what she considers fair is a reality of CERCLA's joint and

7 several liability scheme and its early settlement incentives, not a reflection of any deficiency

8 in the Consent Decree.  Reply at 2.

9    The DTSC makes a valid point.  Pellegrini's dissatisfaction with the allocation of

10 clean-up costs between her and Technichem does not affect the fairness of the Consent

11 Decree.  By arguing that Technichem is responsible for 100% of the costs, Pellegrini is

12 implying that the 50% of total costs allocated to the Settling Defendants is well within their

13 fair share.  Therefore, even if Pellegrini is left paying for clean-up costs that should rightfully

14 be paid by Technichem, it will not be because the DTSC let the Settling Defendants "off the

15 hook."

16        **2.       Estimation of Total Cost of Clean-up**

17    Uncertainty about the exact total clean-up costs should not prevent the settlement of

18 CERCLA litigation.  Recognizing that precise information regarding the total cost of the

19 damage is often not available in the early stages of environmental litigation, Cannons urged

20 district courts to defer to the government agency's estimate so long as it appeared plausible.

21        It would disserve a principal end of the statute— achievement of prompt settlement
         and a concomitant head start on responsive activities— to leave matters in limbo until
22        more precise information was amassed.  As long as the data [that the government
         agency] uses to apportion liability for purposes of a consent decree falls along the
23        broad spectrum of plausible approximations, judicial intrusion is unwarranted . . . .

24 899 F.2d at 88.

25    For the purposes of facilitating settlement, the DTSC has estimated that the total cost

26 of cleaning the Site is $3 million.  Toth Decl. ¶ 17.  The DTSC came to this estimate by

27 taking the sum of (1) the amount it had already incurred from cleaning up the Site to date and

28                                          6

**United States District Court**
For the Northern District of California

1  (2) the costs of future treatment methods that they expected would be required to address the

2  damage.  Id.  Pellegrini's argument—that the estimate is not reliable because the

3  investigation into the contamination of the air and groundwater are not complete—does not

4  persuade the Court.  Michelsen Decl. (dkt. 37-1) ¶ 6.  While additional information on the

5  contamination of the Site would increase the accuracy of the DTSC's estimate, it would

6  come at the cost of both delaying closure of the litigation and responding to the

7  environmental damage, which are goals that the statute prioritizes.

### 3. Settlement Recovery Compared with Allocated Liability is Substantively Fair

9

10  To determine the substantive fairness of a consent decree, a court needs a benchmark

11  against which to compare it.  See United States v. Montrose Chem. Corp. of Cal., 50 F.3d

12  741, 746 (9th Cir. 1995).  In its analysis, a court should compare the clean-up costs that the

13  settling PRPs will pay under the consent decree with the portion of the total cost of clean-up

14  that is allocated to them based on their comparative fault and then factor in "reasonable

15  discounts for litigation risks, time savings, and the like that may be justified."  Id. at 747

16  (quoting Charles George Trucking, Inc., 34 F.3d at 1084-85).  The court should uphold the

17  terms of the settlement so long as "the measure of comparative fault on which the settlement

18  terms are base is not arbitrary, capricious, and devoid of a rational basis."  In re Tutu Water

19  Wells CERCLA Litig., 326 F.3d 201, 207 (3rd Cir. 2003).

20  To reach settlements with the targeted Arrangers, 50% of the total estimated costs—

21  $1.5 million—was proportionally distributed among the Settling Defendants in accordance

22  with the amount of hazardous material that records showed they had contributed to the Site.

23  Toth Decl. ¶ 14.  The Consent Decree provides that the Settling Defendants will collectively

24  pay $186,690.  Malinsky Decl. ¶ 9, Ex. 2.  The fact that the Settling Defendants will pay only

25  slightly more than 10% of the forecasted costs allocated to them does raise the concern that

26  the Consent Decree does not "satisfactorily compensate the public for the actual (and

27  anticipated) costs of remedial and response measures."  Cannons, 899 F.2d at 90.  However,

28

the Court is satisfied that terms of the Consent Decree are based on a rational measure of comparative fault.  Furthermore, the amount paid by the Settling Defendants under the Consent Decree is appropriately discounted for litigation risk and attorneys' fees, which supports the DTSC's assertion that the settlement is reasonable.  For the foregoing reasons, the Court finds the Consent Decree to be substantively fair.

### C.   The Court Will Not Modify the Terms of the Consent Decree Before Approving It

Pellegrini requests that the Court modify the proposed consent in one of two ways. First, she seeks to limit the Settling Defendant's protection from future contribution claims to the DTSC's estimated $3 million total clean-up costs.  Opp'n at 4.  In the alternative, she proposes requiring the Settling Defendants to pay more than $186,690 in exchange for their release from future liability.  Id.

Based on Cannons, Pellegrini argues that parties who settle early should pay a higher price for the protection they receive from unknown costs.  Opp'n at 4.  However, Cannons merely suggested that a party settling early could reasonably be expected to pay a premium in exchange for protection from future liability, not that they must pay such a premium.  The Court of Appeals in Cannons went on to consider the opposite as well—that, in exchange for a prompt resolution, a party settling early might be able to do so at a discount.  Id.

The possibility that inequity to Pellegrini could arise in the future does not justify granting her request for modification at this time.  It is fair to say that limiting the Settling Defendants' contribution protection to the estimated $3 million in clean-up costs could protect Pellegrini from being left with the burden of paying additional clean-up costs.  But protecting non-settling parties does not take priority in the context of CERCLA, a legislative scheme that consistently encourages settlements and capping liability.  See City of Bangor, 532 F.3d at 98.  The Court finds that the Consent Decree should be approved without the

8

1  requested modifications.  The Court will retain jurisdiction in the event that modification

2  becomes necessary or appropriate in the future.[2]

3  **IV.    CONCLUSION**

4         For the foregoing reasons, the DTSC's Motion for Approval and Entry of the Consent

5  Decree (dkt. 34) is GRANTED.

6         **IT IS SO ORDERED.**

7

8

9  _____

10  Dated: July 23, 2013                    CHARLES  R. BREYER
                                            UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26         [2]  District courts' modification of consent decrees on the grounds that a change in factual
    circumstances made enforcement of the original decree unjust have been upheld.  See generally Keith
    v. Volpe 784 F.2d 1457 (9th Cir. 1986); see also United States v. Asarco Inc.430 F.3d 972, 978 (9th Cir.
27  2005) (stating that CERCLA consent decrees could be modified under Fed. R. Civ. P. 60(b)(5)).

28                                            9